# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-0906V
UNPUBLISHED

| | |
|---|---|
| DANA SHERROD,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: May 18, 2022<br><br>Special Processing Unit (SPU); Findings of Fact; Onset; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Jessica Olins*, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.

*James Vincent Lopez*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT**[1]

On June 20, 2019, Dana Sherrod filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her left shoulder on September 25, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

After review of the record and other filings, and for the reasons discussed below, I find that Petitioner's left shoulder pain likely began within the 48-hour timeframe for the Table claim.

## I.     Relevant Procedural History

Ms. Sherrod filed her petition for compensation along with medical record exhibits in June 2019. (ECF No. 1, 5-6). Fourteen months later, Respondent filed a status report stating that he was willing to engage in settlement discussions. (ECF No. 24). The parties attempted to informally resolve the case over the next six months, but were unable to do so. (ECF No. 27). Respondent was thus ordered to file his report pursuant to Vaccine Rule 4(c).

On April 9, 2021, Respondent filed his Rule 4 (c) Report contesting entitlement in this case. (ECF No. 28). Specifically, Respondent argued that Petitioner's Table SIRVA claim failed because she had not established that the onset of her shoulder pain began within 48 hours after receiving her flu vaccination on September 25, 2017. Respondent's Report at 7. In support, Respondent noted that on October 3, 2017 (eight days after vaccination), Petitioner presented to the office of her primary care physician for a follow-up exam regarding her hypertension and insomnia – but did not report any shoulder pain or vaccine related complaints. *Id.; citing* Ex. 6 at 252-54.[3]

Thereafter, the parties filed a status report requesting that I rule on the issue of onset from the record without additional briefing. My ruling is set forth below.

## II.    Issue

The issue presented for resolution is whether the onset of Petitioner's left shoulder pain occurred within 48 hours after vaccination, as required by the Vaccine Injury Table. 42 C.F.R. §§ 100.3(a) XIV.B. (2017) (influenza vaccination) and 100.3(c)(10).

## III.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act § 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.

---

[3] Respondent also argued that Petitioner has not established that she suffered a non-Table injury because there is insufficient evidence that the vaccine administration caused her to suffer a left shoulder injury and because she has not filed an expert report supporting her claim. *Id.* at 8.

§ 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). However, the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." § 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the

injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV.   Findings of Fact

I make the following findings after a complete review of the record to include all medical records, affidavits, Respondent's Rule 4(c) Report, and any additional evidence filed. Specifically, I observe as follows:

- Ms. Sherrod received a flu vaccine in her left deltoid on September 25, 2017. Ex. 1 at 1. She was 52-years-old and the time and an avid runner. Ex. 6 at 32. She states in her affidavit that she completed 66 marathons between 1999 and 2014. Ex. 15 at 1.

- Ms. Sherrod's medical history includes diverticulitis, ovarian cyst, and hypertension.  Ex. 6 at 11, 38. She was involved in a motor vehicle accident in November 2015 which caused bilateral neck, shoulder, and mid-back pain. *Id*. at 42. She had no complaints related to this motor vehicle accident in January 2017 during her annual physical exam. Ex. 6 at 237-240.

- On October 3, 2017, eight days after vaccination, Petitioner presented to her primary care physician in follow up for several chronic conditions including hypertension and insomnia. Ex. 6 at 252. There is no mention of any shoulder complaints during this visit.

- On November 7, 2017, 43 days after vaccination, Ms. Sherrod presented to the office of her primary care physician (PCP) complaining of "cough, fatigue, nasal congestion, throat discomfort, and left deltoid pain after flu shot." Ex. 6 at 256. Certified Physician Assistant (PA-C) Donna White noted that Ms. Sherrod received a flu shot at work and that Petitioner "complains of continuing pain in that arm that [is] affecting the way her arm moves." *Id*.  On examination, PA-C White noted that there was pain at the shoulder with motion (*Id*. at 258), and that there was a possibility that a "cutaneous nerve could have been nicked during

4

- injection…" *Id*. at 258-59. Ms. Sherrod was administered a steroid injection in her left shoulder and was instructed to ice the area of pain twice daily, and to take over-the-counter medications as needed. *Id*. PA-C White also provided a "To Whom It May Concern" letter advising that Ms. Sherod had "experienced deltoid pain after receiving [a] flu shot." *Id.* at 255.

- On December 28, 2017, Ms. Sherrod returned to PA-C White with a complaint of "pain in the arm." Ex. 6 at 260. PA-C White noted that Petitioner returned in follow up regarding pain in her arm "due to receiving the flu shot back in September 25. Since then she states she has been having pain in area of injection; does not radiate." *Id*. On examination, PA-C White noted "palpable spasm posterosuperior to deltoid tendon" but that range of motion was normal. *Id.* at 261-262. She recommended Ms. Sherrod return in two weeks. *Id*.

- On January 24, 2018, Petitioner called her PCP's office reporting that her "pain is still present after flu shot." Ex. 6 at 263.

- On February 1, 2018, Petitioner presented to Dr. Louis A. Torres, her PCP, for a cough and in follow up for her shoulder pain. Ex. 6 at 264. Petitioner reported that she "continues to have pain in left upper arm due to flu injection in September… P[atien]t has tried oral NSAIDS for shoulder [without] help." *Id*. Upon examination, Dr. Torres noted tenderness to palpation in the mid-lateral left deltoid with definite swelling in a three centimeter area. *Id*. at 266. He ordered a sonogram of the left deltoid muscle. *Id*.

- Ms. Sherrod underwent a left shoulder ultrasound on February 19, 2018, which was normal. Ex. 6 at 272.

- On March 19, 2018, Ms. Sherrod presented to Dr. Mitchell Fagelman at OrthoTexas Orthopedics & Sports Medicine for an examination. Ex. 5 at 50. The notes from this visit state "[t]he symptom(s) started DOI [Date of Injury] 9/25/2017" as a result of flu shot administered on that date. *Id*. On examination, Dr. Fagelman noted tenderness present at the "A/C joint, acromion, proximal humerus, greater tuberosity and scapula." *Id*. at 51. He also noted reduced range of motion with the left shoulder, although Ms. Sherrod's strength was intact. Several specialized tests, including the Hawkin's, Neer's, and resisted external rotation tests were positive. *Id*. An x-ray of the left shoulder showed mild AC joint arthritis, but was otherwise normal. *Id*. at 52. Dr. Fagelman's impression was left shoulder bursitis and he administered another left subacromial injection. *Id*. He prescribed physical therapy with strict instructions on performing the exercises daily. *Id*.

- From March 26, 2018, to May 21, 2018, Ms. Sherrod underwent seven sessions of physical therapy. *See generally* Ex. 9. At the initial examination, the physical therapist noted "P[atien]t reports l[eft] shoulder pain and stiffness began on 09/25/17 after receiving a flu shot." Ex. 9 at 2. She was discharged on May 21, 2018, to a home exercise plan when it appeared that Ms. Sherrod's symptoms were worsening from PT. *Id*. at 14.

- On May 25, 2018, Petitioner underwent an MRI of her left shoulder. Ex. 4 at 2. The impression was "[f]ull-thickness supraspinatus tendon tear with partial retraction from interstitial delamination." *Id*.

- On June 4, 2018, Ms. Sherrod presented to Dr. Fagelman who, after reviewing the results from the MRI, recommended that Petitioner proceed with surgery "[d]ue to the full-thickness component of the tear." Ex. 3 at 36. Ms. Sherrod agreed to proceed with surgery. *Id*.

- On the pre-operative evaluation sheet, Ms. Sherrod listed the date that her symptoms as occurring on September 25, 2017, as a result of the flu shot. Ex. 5 at 55.

- Petitioner underwent a pre-operative examination on June 5, 2018, Ex. 3 at 30, and underwent a rotator cuff repair, subacromial decompression, debridement and open subpectoral biceps tenodesis surgery on June 22, 2018. *Id*. at 9, 36, 53-54. The operative note from the surgery states that "[d]iagnostic arthroscopy showed upper rolled border of the subscapularis tear with biceps subluxation and mild tearing. There was an articular side tear of the anterior aspect of the supraspinatus… There was a type II SLAP tear…The subacromial space showed extensive fraying of the coracoacromial ligament. There was a concomitant high-grade bursal-sided tear at the side of the articular tear approximately 90%." *Id*. at 54.

- At her first post-operative visit on June 25, 2018, Ms. Sherrod was noted to be healing well, her incisions were clean, dry, and intact, and her pain was controlled. Ex. 5 at 46. She was instructed to follow up in two weeks. *Id*.

- Ms. Sherrod began physical therapy on July 31, 2018. Ex. 5 at 37. The date of injury/onset is listed in the PT notes as September 25, 2017. *Id*. Under mechanism of injury, the physical therapist notes "P[atien]t reports l[eft] shoulder pain after flu shot." *Id*. at 24. Ms. Sherrod underwent eight PT sessions over a six week period, but still had some left shoulder tightness and weakness at her last visit. *Id*. at 3.

6

- On September 14, 2018, Dr. Fagelman noted that Ms. Sherrod's incision had "fully healed" and that her range of motion was "acceptable." He encouraged Ms. Sherrod to begin strength training as her left shoulder tendon was "only 50% strong." Ex. 11 at 2.

- By December 13, 2018, Ms. Sherrod reported "0" on the intensity of pain scale and denied any left shoulder pain, but still had weakness. Ex. 11 at 3. Dr. Fagelman discharged Ms. Sherrod from the clinic noting that "full recovery can take up to a year." *Id.* at 5. She was instructed to follow up as needed. *Id.*

- Ms. Sherrod filed two affidavits to explain the circumstances she recalled surrounding her receipt of the flu vaccine and to explain her delay in seeking medical treatment for her shoulder. Ex. 13, 15. She stated that on September 25, 2017, the "vaccine was injected high on my left arm, and I had sharp pain immediately during and after the shot. I went home that night and took some Tylenol, hoping the throbbing would go away, but had problems sleeping due to discomfort." Ex. 13 at 1, ¶4. Regarding the delay in seeking treatment, Ms. Sherrod explained that she is an avid runner, completing 66 marathons between 1999 and 2014. Ex. 15 at 1, ¶1. As such, she was used to experiencing many aches and pains from her long runs, knowing that recovery from a marathon can take "anywhere from 5-10 days." *Id.* at ¶2. She did not go to a physician "unless the ache or pain did not go away." *Id.* Ms. Sherrod also states that she did not mention her shoulder pain to her physician during the October 3, 2017 visit, just eight days after vaccination, because "I thought it was going to go away…" *Id.* at 2, ¶5.

- Ms. Sherrod also filed an affidavit from her husband, John Sherrod, who corroborated Petitioner's statements that she "rarely" complained of pain, especially if the pain was minor. Ex. 16 at 1. Regarding the vaccination at issue, Mr. Sherrod also recalled that Petitioner "mentioned that the shot hurt far more than normal at the time of the injection and then was quite painful over the first few days." *Id.*

### V.     Ruling Regarding Onset

The parties have elected not to filing briefs regarding the issue of onset, and instead have requested that I rule on the issue based on the current record. In reviewing the Rule 4(c) Report, I observe that Respondent's argument against a finding of 48-hour onset of shoulder pain is largely based on a single medical record, dated eight days after Ms. Sherrod was vaccinated, which makes no mention of any shoulder injury. Respondent's Report at 7. Respondent particularly emphasizes that the notes from this visit state that Petitioner was "doing well and had no current complaints." *Id.*; Ex, 6 at 252.

Ms. Sherrod's physical exam at this time was also unremarkable. Because Ms. Sherrod did not specifically complain of shoulder pain within 48 hours to a physician, Respondent states that onset cannot be preponderantly "timed" to have begun within two days.[4] *Id*.

Admittedly, Petitioner well could have complained of her shoulder pain at the time of this treatment event, but did not. Nevertheless, the record is replete with instances *later* where Petitioner reported that her left shoulder pain began at, or immediately following her September 25, 2017 vaccination. Indeed, she consistently did so after the first record in which she directly sought treatment. And although she waited 43 days before reporting her shoulder pain, she has provided a credible explanation for waiting – that her activities as a runner made her less inclined to immediately seek treatment for what could, in her experience, constitute merely a transient delay. I thus do not find that the single initial record that omits a reference to immediate pain should be given so much weight herein that it cuts against a favorable onset finding.

In addition, the 43-day gap from purported onset to treatment is not inconsistent with what other Program petitioners experience, based on the assumption that their pain is likely transitory. Many SIRVA cases feature medical record notations from physicians recommending that a patient wait a period of time after vaccination to allow time for the shoulder pain to fade before seeking treatment. Subsequent records all corroborate the injury and onset, and the Vaccine Act expressly does not obligate claimants to prove onset issues with evidence from *within* the alleged timeframe in any event. Section 13(b)(2).

Another factor that weighs in favor of a finding of 48-hour onset of left shoulder pain is the absence of any statement or record that places the onset of Ms. Sherrod's left shoulder pain *outside* the 48-hour window. By contrast, there are many instances where Ms. Sherrod reports that her pain began on the day of vaccination. *See e.g.*, Ex. 6 at 260 (regarding pain in her arm "due to receiving the flu shot back in September 25 … Since then she states she has been having pain in area of injection."); Ex. 5 at 50 ("[t]he symptom(s) started DOI [Date of Injury] 9/25/2017" as a result of flu shot administered on that date); Ex. 9 at 2 ("P[atien]t reports l[eft] shoulder pain and stiffness began on 09/25/17 after receiving a flu shot.")

Here, as in other cases, Respondent argues that a special master cannot rely on the statements of the petitioner alone. *See e.g., Juno v. Sec'y of Health & Human Servs*., No. 18-643, 2021 WL 4782691, at * 5 (Fed. Cl. Spec. Mstr. Sept. 13, 2021). But the Federal Circuit has expressly recognized that witness testimony on issues pertaining to

---

[4] Respondent also notes that Petitioner had full range of motion during the November 7, 2017, visit. However, the QAI does not require that reduced range of motion, unlike shoulder pain, occur within 48 hours of vaccination. Later records do establish that Ms. Sherrod had a reduced range of motion. *See, e.g.*, Ex. 5 at 51.

fact matters like symptoms onset *can* be proven by reliance on testimonial evidence (even if the evidence must be weighed against the records themselves, which continue to have evidentiary significance). *Kirby*, 997 F.3d at 1383. Respondent has not identified any inconsistencies or discrepancies in the medical records. All references to onset clearly relate Petitioner's left shoulder pain as occurring immediately after vaccination. Taken as a whole, I find the sworn testimony of Ms. Sherrod to be credible and in agreement with all of the contemporaneously created treatment records, and it provides a rationale for a finding in her favor.

Weighing the evidence overall, I find that Petitioner has met her burden, and thus that onset of Petitioner's left shoulder pain began within 48 hours of vaccination.

### VI. Scheduling Order

Given my findings of fact regarding onset of Ms. Sherrod's left shoulder pain, Respondent should evaluate and provide his current position regarding the merits of Petitioner's case.

**Accordingly, Respondent shall file, by no later than Friday, July 1, 2022, an amended Rule 4(c) Report reflecting Respondent's position in light of the above fact-finding.**

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master
